# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: January 3, 2024

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| J. G., | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 20-664V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Ruling Awarding Damages; Hepatitis A |
| AND HUMAN SERVICES, | * | Vaccine; Guillain-Barré Syndrome |
| | * | ("GBS"); Pain and Suffering; |
| Respondent. | * | Unreimbursable Expenses. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

<u>Anne Carrion Toale</u>, Maglio Christopher and Toale, Sarasota, FL, for Petitioner.
<u>Julia Marter Collison</u>, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON DAMAGES[1]

On June 1, 2020, J.G. ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleges that he suffered Guillain-Barré Syndrome ("GBS") as the result of a hepatitis A vaccination administered on April 19, 2018. Petition at 1-5 (ECF No. 1). On February 13, 2023, the undersigned issued a Ruling on Entitlement, finding that Petitioner was entitled to compensation. Ruling on Entitlement dated Feb. 13, 2023 (ECF No. 67).

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs. Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $170,000.00 for actual pain and suffering, $500.00 per year for Petitioner's life expectancy reduced to net present value for future pain and suffering, and $6,430.80 for past unreimbursed expenses.[3]

**I.    PROCEDURAL HISTORY**

Petitioner filed his petition on June 1, 2020. Petition. The early procedural history from June 2020 through May 2022 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here. See Ruling on Entitlement at 4.

Following the undersigned Ruling on Entitlement in February 2023, the parties engaged in settlement discussions but were not able to resolve this matter informally. Joint Status Report ("Rept."), filed Apr. 14, 2023 (ECF No. 77). Petitioner filed updated medical records and a declaration from Petitioner on April 14, 2023. Petitioner's Exhibits ("Pet. Exs.") 25-27. The parties indicated that they did not believe ADR would be productive and requested to submit the disputed items of damages for the Court's resolution by briefing. Joint Status Rept., filed Apr. 21, 2023 (ECF No. 79).

On April 24, 2023, Petitioner filed a brief in support of his claim for damages. Pet. Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Mot."), filed Apr. 24, 2023 (ECF No. 81). Respondent filed his responsive brief on June 2, 2023. Respondent's Brief on Damages ("Resp. Br."), filed June 2, 2023 (ECF No. 82). Petitioner filed a reply on June 22, 2023. Pet. Reply in Support of Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Reply"), filed June 22, 2023 (ECF No. 83).

This matter is now ripe for adjudication.

**II.   FACTUAL HISTORY**

The Ruling on Entitlement issued on February 13, 2023 and set forth a summary of Petitioner's medical records and declarations. See Ruling on Entitlement at 4-11. Further, the parties have set forth summaries of relevant facts which support their respective positions in their briefs, which the undersigned has reviewed as well as all of the medical records and evidence filed in this matter.

---

[3] "The parties [] reached an agreement to resolve the issue of past medicals and mileage expenses in the amount of $6,430.80." Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Mot."), filed Apr. 24, 2023, at 3 (ECF No. 81); see also Respondent's Brief on Damages ("Resp. Br."), filed June 2, 2023, at 1 (ECF No. 82). The only item in dispute is past and future pain and suffering. Pet. Mot. at 3-4.

A brief summary of some facts relevant to this Decision follows.  While all the records are important, these entries provide specific information about Petitioner's condition important to the undersigned's Decision.

### A. Brief Medical Record History

At 38 years of age, Petitioner received a hepatitis A vaccination on April 19, 2018.  Pet. Ex. 1 at 2.

On June 4, 2018, Petitioner presented to his primary care physician complaining of tingling in his feet, hands, and tongue as well as leg cramps for two weeks.  Pet. Ex. 3 at 379.  Petitioner reported his symptoms (feet tingling) began May 25, 2018 "when he was working out at the gym."  Id.  The tingling progressed to his hands.  Id.  By May 29, he had "cramping in his right leg and hip," and by June 2, "his tongue started tingling."  Id.  Physical examination revealed patellar reflexes of 2+ on the right and left side.  Id. at 381.  Assessments were tingling in extremities and acute right-sided low back pain without sciatica.  Id.  Petitioner was given a Medrol Dose Pak.  Id.

Petitioner returned three days later on June 7, 2018.  Pet. Ex. 3 at 338.  Petitioner reported worsening back pain, sore neck, and continued tingling in arms and legs.  Id. at 339.  He had been on a steroid dose pack for three days, which provided him temporary pain relief and help with walking but wore off after a few hours.  Id.  He reported that as the steroid wore off, "he [felt] like his legs [were] weak and [] like he [was] going to fall."  Id.  Physical examination revealed patellar reflexes of 2+ on the right and left side, as well as tenderness in cervical back and bony tenderness in lumbar back.  Id. at 340.  Assessment included numbness and tingling of both lower extremities, acute bilateral low back pain without sciatica, weakness of both lower extremities, tingling in extremities, cervical pain, and myelopathy.  Id. at 341.  Magnetic resonance imaging ("MRI") of lumbar and cervical spine were ordered and Petitioner was referred to physical therapy ("PT").  Id.

Later that day, Petitioner had a PT evaluation with physical therapist McKenzie Emrick at Premier Therapy and Health Centers ("Premier").  Pet. Ex. 2 at 3.  Petitioner reported symptom onset was May 25, 2018, and he reiterated his history and complained of increased low back pain and numbness and tingling in bilateral hands and feet.  Id.  Physical examination revealed decreased lumbar and cervical active range of motion as well as decreased strength bilaterally in hip and knee extensors and flexors, ankle dorsiflexors and plantar flexors, and shoulder flexors.  Id. at 4-5.  Ms. Emrick noted Petitioner reported increased weakness in bilateral legs, pain, and overall muscle tightness on some movements.  Id. at 5.  Petitioner also had increased weakness and difficulty with the right side more than the left.  Id.  Assessment was "bilateral hand and feet numbness/radicular symptoms with low back pain with resultant decrease in patient mobility, strength, [range of motion], and functional [activities of daily living]."  Id.  Petitioner attended additional PT sessions on June 8 and 11, 2018, until he was discharged on June 26.  Id. at 7-14; Pet. Ex. 8 at 39-40, 48-49, 54-61.

MRI of the cervical spine conducted on June 13, 2018 noted degenerative disc disease most prominent at C5/C6 and C3/C4. Pet. Ex. 4 at 35-36. Lumbar spine MRI done the same day showed focal central disc herniation at L5/S1. Id. at 37-38.

The following day, on June 14, 2018, Petitioner visited Lexington Clinic and saw neurosurgery certified physician assistant ("PA-C") Justin Sammons. Pet. Ex. 4 at 15. Petitioner noted his complaints had persisted for three weeks and consisted of numbness, tingling, weakness, and pain, described as burning and deep ache that would come and go and was usually a 2/10 on the pain scale. Id. at 20. Petitioner also reported dizziness, night sweats, unintended weight loss, mouth dryness, stiff or swollen joints, problems sleeping, poor coordination, sexual dysfunction, and difficulty walking, swallowing, and with taste/smell. Id. at 19. Petitioner reported that "[o]ver the last four days[,] his weakness ha[d] progressed that he [] had to use a rolling walker to help him ambulate. He ha[d] also developed significant difficulty rising from a chair and [was] unable to do so without the use of his arms." Id. at 16. Petitioner also reported loss of taste, swallowing difficulty, and inability to stop urinating voluntarily. Id.

Physical examination found 4/5 strength in bilateral lower and upper extremities, poor control of extremities through range of motion, and absent deep tendon reflexes in bilateral upper and lower extremities. Pet. Ex. 4 at 16-17. Assessment was muscle weakness. Id. at 17. PA-C Sammons and neurosurgeon Dr. Matthew Tutt reviewed the MRIs and found no explanation on MRI for Petitioner's symptoms and determined "[t]here [was] no indication for neurosurgical intervention." Id. They noted Petitioner's "exam[ination] and history suggest[ed] a demyelinating process." Id. Thoracic spine and brain MRIs were done later that day, on June 14, 2018. Id. at 33-34. Thoracic spine impression was mid-thoracic spine degenerative joint disease including central protrusion at T7/8. Id. at 33. MRI of the brain was normal. Id. at 34. Petitioner was directed to see neurologist Dr. Andrew Schneider for a neurologic evaluation. Id. at 17.

The next day, June 15, 2018, Petitioner saw Dr. Schneider. Pet. Ex. 4 at 12. History of present illness reiterated Petitioner's clinical course. Id. at 14. Petitioner reported that he felt his symptoms had plateaued over the past few days. Id. Dr. Schneider noted Petitioner's recent MRIs were "unrevealing," showing "no significant abnormality," "no cervical myelopathy," and "no surgical lesion" as indicated by Dr. Tutt. Id. Physical examination "show[ed] weakness in the arms and legs proximally and distally," 3/5 strength in deltoids and biceps, 4/5 strength in triceps, 4-/5 strength in wrist flexion and extension, 3-4/5 strength in first dorsal interosseous, "weak" abductor pollicis brevis muscle, 3/5 strength in hip and knee flexion, 4/5 strength in quadriceps, 4/5 dorsiflexion but better on the right, 3-4/5 plantar flexion, absent deep tendon reflexes, wide-based unsteady gait, and positive for Romberg's. Id. at 15. Assessment was GBS, with evidence of "progressive weakness in the arms and legs proximally and distally with distal paresthesias over the past ~ [three] weeks" and areflexia on examination. Id. at 13, 15. Dr. Schneider thought Petitioner's case "[was] almost certainly GBS." Id. Dr. Schneider ordered a lumbar puncture[4] and electromyography ("EMG")/nerve conduction study ("NCS"). Id. at 13,

---

[4] Lumbar puncture was cancelled "as it was no longer needed following" the results of the EMG/NCS. Pet. Ex. 5 at 10. Dr. Lori McIntosh wrote, "[g]iven the clinical presentation is classic for AIDP will not do lumbar puncture at this time." Id. at 21.

15. "[A]ssuming nothing surprising [was] seen, then [he] would treat with [intravenous immunoglobulin ("IVIG")]." Id. at 15.  Dr. Schneider arranged for Petitioner to be admitted to St. Joseph's Hospital.  Id.; Pet. Ex. 5 at 10.  EMG/NCS was conducted that day, prior to admission, and findings were "compatible with GBS" in "clinical setting of rapidly progressive weakness."  Pet. Ex. 4 at 13, 15, 31-32.

Petitioner was admitted on June 15, 2018 for five days of IVIG.  Pet. Ex. 5 at 10.  He also received PT and occupational therapy during his stay.  Id.  Petitioner was discharged on June 19, 2018.  Id.  He was noted to have "improve[d] his strength and mobility being able to go [up and down] multiple steps."  Id.  Petitioner "still experience[d] some numbness and tingling of his hands and feet."  Id. at 11.  Discharge diagnosis was acute inflammatory demyelinating polyneuropathy ("AIDP")/GBS.  Id.

On June 27, 2018, Petitioner presented to King's Daughters Medical Center ("King's Daughters") for an initial PT evaluation with physical therapist Amy Hay.  Pet. Ex. 3 at 216.  Petitioner reported muscle soreness, particularly in back and calf; neuropathy in hands; numbness in face, particularly in top of nose; difficulty with stairs, particularly with descending; and fatiguing easier.  Id.  He was ambulating with a cane.  Id.  Physical examination revealed "decreased core stability, impaired balance, impaired sensation[,] and functional mobility deficits."  Id. at 218.

Petitioner returned to Dr. Schneider on June 29, 2018.  Pet. Ex. 4 at 10.  Since Petitioner's hospitalization and IVIG, Petitioner was doing better.  Id.  His strength improved, although he tired easily, still felt "wobbly on his feet [], and ha[d] mild difficulty with descending more than ascending stairs."  Id. at 11.  Dr. Schneider noted Petitioner was using a cane.  Id.  Petitioner's "hypersensitivity [was] better in the feet, though they still fe[lt] numb," and "[h]is hands fe[lt] like prunes."  Id.  Physical examination noted Petitioner's "strength [was] much better today than two weeks ago."  Id.  Dr. Schneider "[found] mild weakness of biceps bilaterally (4+/5) and knee flexion [was] about 4/5 on the right, but other muscles proximally and distally [were] normal or nearly so."  Id.  Petitioner's deep tendon reflexes remained absent.  Id.  His tone and coordination were "ok[ay]," "[g]ait [was] much more steady," and Romberg's test was now negative.  Id.  Dr. Schneider determined Petitioner could return to work part-time and then full-time by the end of July if he continued to improve.  Id.

After 14 PT sessions at King's Daughters, Petitioner was discharged from PT on August 20, 2018.  Pet. Ex. 3 at 108.  Petitioner reported he was "[d]oing much better" and was "[a]ble to carry [his] son up/down stairs with no difficulty."  Id.  He "[c]ontinue[d] to have neuropathy in [h]ands, feet[,] and nose."  Id.  Ms. Hay noted Petitioner was "[a]mbulating independent with no assistive device" and "ha[d] demonstrated significant improvement since initiating PT."  Id. at 108-09.

Petitioner returned to Dr. Schneider on August 28, 2018.  Pet. Ex. 4 at 8.  Petitioner's strength had improved and he was working full-time.  Id. at 9.  He continued to have tingling in his nose and fingers, sometimes with sharp pains in toes and feet.  Id.  Physical examination revealed "basically normal strength, perhaps 5-/5 biceps."  Id.  Deep tendon reflexes were 1+ in

5

biceps bilaterally, diminished/absent in knees, and absent in ankles. Id. Dr. Schneider noted "residual paresthesias are not unexpected and this will probably continue to improve." Id. at 10.

On December 18, 2018, Petitioner followed up with Dr. Schneider. Pet. Ex. 4 at 5. Petitioner "ha[d] been doing better overall" but "ha[d] a few residual symptoms." Id. at 7. He still experienced tingling in nose, feet, and toes, but his "[h]ands [were] largely better, 95% better." Id. Physical examination revealed normal strength in arms and legs, deep tendon reflexes of 1+ at biceps, reduced deep tendon reflexes at knees, and diminished/absent deep tendon reflexes at ankles. Id. at 7-8. Dr. Schneider prescribed Cymbalta[5] to help with Petitioner's "residual tingling and cutaneous burning discomfort" attributed to his GBS. Id. at 8; see also Pet. Ex. 21 at 3 (indicating Petitioner filled this prescription that day, December 18, 2018, for 30 capsules). EMG/NCS conducted that day revealed findings compatible with mild polyneuropathy. Pet. Ex. 4 at 30. Significant improvement was seen when compared to the prior study done in June 2018. Id.

Petitioner returned to Dr. Schneider for a follow-up visit on May 2, 2019. Pet. Ex. 4 at 3. Petitioner reported no pain, intermittent tingling of feet and nose, and good strength and balance. Id. at 4. Petitioner reported he took only one dose of Cymbalta due to side effects. Id. at 4. Physical examination revealed "very normal strength, bulk, [and] tone in arms and legs;" deep tendon reflexes of 2+ at knees, 1+ at biceps, and reduced/absent at ankles; and normal gait. Id. Dr. Schneider noted Petitioner "ha[d] mild residual sensory symptoms" that "may continue to slowly improve," but believed there was nothing else that needed to be done. Id.

At an annual wellness visit on December 17, 2019, Petitioner reported intermittent tingling and numbness. Pet. Ex. 3 at 18-20. Physical examination was normal, including a normal gait. Id. at 20. He requested a referral to PT for right elbow pain, which was assessed as right tennis elbow. Id. at 18.

Petitioner returned to PT at Premier on January 15, 2020 for his right elbow. Pet. Ex. 8 at 6. Petitioner reported his symptoms began "in 2018 with . . . [GBS]." Id. Physical examination by physical therapist Taylor Ison revealed strength, range of motion, balance, and coordination "within functional limits" except for tenderness to palpation at right lateral epicondyle, positive finger lift test, and pain with manual muscle testing and grip strength testing. Id. at 7. Assessment was "[right] lateral epicondylitis with resultant pain patterns, decreased [range of motion], weakness, and impaired functional abilities." Id. The assessment did not attribute Petitioner's elbow pain to his GBS.

On January 27, 2020, Petitioner began PT for right hip pain he reported began in "2018 with . . . [GBS]." Pet. Ex. 8 at 30. Assessment by Rebekah Green, P.T., was "chronic right hip pain secondary to overuse syndrome and GBS that resulted in the following deficits: weakness, decreased [range of motion], pain with functional activities, and ability to perform functional activities." Id. at 31.

---

[5] Among its various uses, Cymbalta (duloxetine) is prescribed to treat nerve pain as well as chronic pain. Duloxetine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited Dec. 22, 2023).

By February 17, 2020, Petitioner reported "less pain and some neuropathy [was] gone," but he continued to have neuropathy and weakness in left lower and upper extremity." Pet. Ex. 8 at 33. "He reported the symptoms were worse on the [right], but now that the [right] is getting stronger he feels like the [left] is weaker and throwing him off balance." Id. Physical therapist Rebekah Green noted Petitioner "ha[d] made moderate improvements" since starting PT but continued to demonstrate several impairments. Id. Petitioner attended a total of 15 PT sessions in January and February 2020. Id. at 10-38, 41-47, 50-53.

Petitioner refilled his Cymbalta prescription on March 20, 2020, and continued to do so throughout 2020. Pet. Ex. 21 at 3, 6-7.

On October 1, 2020, Petitioner had an annual wellness visit. Pet. Ex. 22 at 29. Petitioner reported intermittent numbness in hands and feet as well as fatigue. Id. at 31. He stated he takes Cymbalta for the numbness. Id. He was given refills for Cymbalta, which he filled that day, October 1, 2020, and continued to fill throughout 2021. Id. at 29, 31; Pet. Ex. 21 at 6-7.

One year later, on October 21, 2021, Petitioner had his annual wellness visit with his primary care physician. Pet. Ex. 22 at 2. Petitioner reported numbness in hands and feet. Id. at 5. Petitioner was up-to-date on Covid-19 vaccines but "desire[d] no additional vaccines due to history of GBS with [h]ep[atitis] A vaccine." Id. at 4. He was given refills for Cymbalta, which he filled on October 21, 2021 and throughout 2022. Id. at 6; Pet. Ex. 21 at 6-7; Pet. Ex. 26 at 3.

On May 31, 2022, Petitioner received a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination. Pet. Ex. 25 at 3. Petitioner returned for an annual wellness visit on November 22, 2022. Id. at 4. "Neuropathy due to history of GBS" was described as "chronic." Id. History of present illness recorded continue neuropathy in his feet due to his GBS and "Cymbalta every other day seems to keep his symptoms at bay." Id. at 5. His "[c]hronic conditions [were] stable with current regimen." Id. at 7. He was again given refills for Cymbalta. Id. at 7-8.

No additional records have been filed.

**B.     Petitioner's Declarations**[6]

Prior to vaccination, Petitioner "was an active individual that worked out at least [three] times per week," with "hobbies includ[ing] boating, fishing, hunting, camping[,] and . . . about anything outdoors." Pet. Ex. 20 at ¶ 1. He also enjoyed woodworking and described himself as a "do it yourselfer when it comes to maintenance and updates." Id. His widowed mother and widowed sister relied on him heavily, as he is "the last adult male in [his] immediate family." Id. "[He] felt the pressure of keeping fit, eating healthy[,] and not taking unnecessary risks." Id.

---

[6] Petitioner provided two declarations. Pet. Exs. 20, 27. His second declaration was almost identical to the first, and therefore, the undersigned cited to Petitioner's second declaration only when relevant. Compare Pet. Ex. 20, with Pet. Ex. 27.

7

Petitioner detailed his clinical course.  See Pet. Ex. 20.  He had tingling in his extremities, face, and tongue; generalized and progressive weakness in his extremities; "severe cramping from [his] waist down; "occasional electrical current shooting through [his] arm and legs;" difficulty with coordination, balance, ambulating, and activities of daily living; and incontinence.  Id. at ¶¶ 3-6.  He described that during the time in which multiple medical providers were unable to determine a proper diagnosis and treatment, he felt as he "was being looked at as a lost cause."  Id. at ¶ 7.  He explained that he

> tried to appear as if [he] was not worried as much as [he] could for [his] wife and family, though on the inside, [he] was in sheer panic.  [He] was doing [his] best to prepare for what [he] was beginning to believe was an inevitable death.  [He] was ensuring that [his] insurance documentation was in order and making sure that a plan was laid out for [his] wife to take upon [his] death.  [He] started putting into place plans to sell . . . recreational assets (I.e. camper, boat).  In casual conversation, [he] was letting [his] wife know what [his] wishes were for [his] boys and her, never being direct and always trying to keep up the appearance of hope.  Extended family began traveling to visit [him] . . . .  [His] mother was spending all her time trying to help everywhere that she could, and [his] in-laws were "closely" keeping their distance, not wanting to let on their level of concern for [his] wife and their grandchildren.

Id.  His wife helped feed and bathe him.  Id. at ¶ 9.  She helped him go to the bathroom, "even wiping [his] bottom for [him]," which was "truly horrifying for [him]."  Id.  He was unable to assist with maintaining the house or responsibilities.  Id.  By the time he was diagnosed, he was "happy" but also "anxious to start the treatments."  Id. at ¶ 14.

Petitioner was hospitalized for five days, from June 15 to June 19, 2018, where he saw multiple providers and underwent a five-day course of IVIG.  Pet. Ex. 20 at ¶ 15.  Upon discharge, he was able to support his weight but required a walker to ambulate.  Id. at ¶ 16.  He began outpatient PT and averred that he continued PT until November 2018.[7]  Id.  He returned to work with a walker part-time/light-duty on July 9, 2018, full-time/light-duty with a cane on July 31, 2018, and then his light duty restriction was lifted.[8]  Id.

Although his employer continued to ensure he had a job to return to, he questioned his job security.  Pet. Ex. 20 at ¶ 8.  He returned to work in July 2018, first part-time with a walker, and then full-time with a cane.  Id. at ¶ 16.  Upon his return to work, he delt with prejudice from peers and management.  Id. at ¶ 17.  He "often felt the need to justify [his] absence from work, [his] fatigue, [his] walker and then cane, and even found [himself] having to re-prove [his] mental abilities."  Id.  He averred that he continues to get questions at work that single him out for his GBS.  Id.  He added that he "feel[s] a constant stigma surrounding [his] GBS episode."  Id.

---

[7] Petitioner was discharged from PT after 14 sessions on August 20, 2018.  Pet. Ex. 3 at 108.

[8] Petitioner did not document the exact date his light duty restriction was lifted.  Pet. Ex. 20 at ¶ 16.

Petitioner also explained that he lost one year with his three children. Pet. Ex. 20 at ¶ 20. They "would normally have spent [their] summer camping, fishing, boating[,] and taking at least one 'big' family vacation." Id.

An EMG/NCS conducted on May 2, 2019 confirmed Petitioner still had some nerve damage. Pet. Ex. 20 at ¶ 18. Dr. Schneider indicated Petitioner "could continue to heal and eventually make a full recover[y]." Id. Petitioner "started [PT] again in January 2020 at the recommendation of [his] family doctor for [his] right hip and arm, which continue[d] to have pain and weakness." Id. Petitioner stated his "physical therapist believe[d] that [he] experienced atrophy in [his] hip and forearm during [his] GBS episode[] that [led] to severely underdeveloped muscles." Id. Although he stopped PT at the start of the Covid-19 pandemic in March 2020, he "continue[d] the exercises and stretches and ha[s] seen some improvement in both [his] hip and arm." Id.

As of the date of Petitioner's first declaration, executed on November 3, 2021, Petitioner "still experience[d] neuropathy in [his] feet, hands[,] and face; the severity varies and can sometime[s] be linked to anxiety and/or stress." Pet. Ex. 20 at ¶ 18. He felt his strength and stamina have not returned to what they were pre-GBS. Id. Petitioner was taking Cymbalta for his neuropathy,[9] which "increased in severity during the early months of the pandemic, brought on by increased stress." Id. at ¶¶ 19, 21. "Every time [he] feel[s] an electrical surge, a cramp, or the severity increasing in [his] neuropathy, [he is] immediately on high alert and spend[s] the next several days convincing [himself] that [he is] not relapsing." Id. at ¶19. Petitioner believes he is "back to roughly 90% on the energy level, and 80% of the fitness level that [he] was pre-GBS." Id. at ¶ 20.

Petitioner's second declaration, executed on April 3, 2023, added that Petitioner believed he would never be back to "normal," and instead, he was "beginning to accept this [was] the new 'normal.'" Pet. Ex. 27 at ¶ 19. He averred that he was still taking Cymbalta, was not as active as he was pre-GBS, lost agility, and continues to experience anxiety concerning future vaccinations and potential GBS symptoms. Id. Additionally, he reported a gag reflex and nose that were "more sensitive than before GBS," causing his to gag, burp, and dry heave uncontrollably, which "never happened . . . before GBS." Id. He now "believe[d] [he] [was] back to roughly 85% on the energy level[] and 80% of the fitness level that [he] was pre-GBS." Id.

## III.   PARTIES' CONTENTIONS[10]

### A.   Petitioner's Contentions

Petitioner requests $180,000.00 for past pain and suffering and $500.00 per year for his life expectancy for future pain and suffering "given that he remains on Cymbalta for neuropathic

---

[9] In his second declaration, executed on April 3, 2023, Petitioner added that he "tak[es] Cymbalta at the recommendation of [his] neurologist." Pet. Ex. 27 at ¶ 18.

[10] The undersigned addressed only those arguments she finds relevant to her determination.

9

pain five years after GBS, which his own doctor characterizes as 'chronic.'" Pet. Mot. at 14, 17; Pet. Reply at 9.

In support of his request, Petitioner first provides a summary of the case and facts. Pet. Mot. at 8-14. Prior to vaccination, Petitioner was a healthy 38-year-old engineer who was married with three children, ages seven to 14. Id. at 8. He was active, working out at least three times per week, and enjoyed outdoor activities, such as boating, fishing, hunting, camping, and woodworking. Id. He assisted his widowed mother and widowed sister "who relied on him heavily." Id. Petitioner felt "his sudden and severe illness was even more devasting for him and his family" due to the previously unexpected deaths of his father and brother-in-law. Id.

Petitioner's GBS symptoms began on May 25, 2018; however, multiple providers were unable to properly diagnose him with GBS until his hospitalization on June 15, 2018. Pet. Mot. at 8. During those three weeks, "[h]e was losing his ability to stand, walk, and bathe himself; he became incontinent[;] [h]e developed electrical shock and cramping sensations[;] and [he] was unable to sleep with high blood pressure and heart rate." Id. at 8-9 (internal citations omitted). He had to rely on his wife to be his caregiver, which included her "having to wipe him after bowel movements, which was 'truly horrifying' for him." Id. at 9 (quoting Pet. Ex. 27 at ¶ 8). When multiple providers were unable to diagnose him, he "got the impression that [he] was being looked at as a lost cause. [He] tried to appear as if [he] was not worried . . . , though on the inside, [he] was in sheer panic." Id. (quoting Pet. Ex. 27 at ¶ 6). He was "prepar[ing] for what [he] was beginning to believe was an inevitable death." Id. (quoting Pet. Ex. 27 at ¶ 6). He described that he

> was ensuring that [his] insurance documentation was in order and making sure that a plan was laid out for [his] wife to take upon [his] death. [He] started putting into place plans to sell . . . recreational assets (I.e. camper, boat). In casual conversation, [he] was letting [his] wife know what [his] wishes were for [his] boys and her, never being direct and always trying to keep up the appearance of hope. Extended family began traveling to visit . . . . [His] mother was spending all her time trying to help everywhere that she could, and [his] in-laws were "closely" keeping their distance, not wanting to let on their level of concern for [his] wife and their grandchildren.

Id. (quoting Pet. Ex. 27 at ¶ 6). Petitioner, upon receiving a diagnosis, was "happy to have a diagnosis and anxious to start the treatments." Id. at 10 (quoting Pet. Ex. 27 at ¶ 13).

Petitioner was hospitalized from June 15 to June 19, 2018. Pet. Mot. at 10. He underwent an EMG/NCS prior to hospitalization and five days of IVIG prior to discharge. Id. He ambulated with a walker on discharge. Id. He attended 14 PT visits until August 2018. Id. He returned to PT in January 2020 due to "pain in his right hip and arm, secondary to overuse syndrome and GBS." Id. at 10-11. Although PT was discontinued at the end of February 2020 due to Covid-19, Petitioner continued his at-home exercises. Id. at 11.

In response to Respondent's arguments that Petitioner's 2020 PT sessions were unrelated to his GBS, Petitioner contends the physical therapists "determine[d] that the mechanism behind

10

[Petitioner's] elbow and hip pain was GBS" and "attributed his ongoing bilateral upper and lower extremity weakness (in 2020) to GBS." Pet. Reply at 2. Although Petitioner self-reported his pain was due to his GBS, Petitioner explained this pain resulted from him over compensating while recovering from GBS. Id. at 2-3. Additionally, the physical therapist's assessment stated Petitioner's "chronic right hip pain secondary to overuse syndrome and GBS [] resulting in . . . deficits," and Petitioner received therapies consistent with a plan of care due to his GBS. Id. at 3-5 (quoting Pet. Ex. 8 at 31). Thus, Petitioner concludes "[t]here is clearly preponderant evidence that [Petitioner's] 2020 PT sessions are related to his GBS." Id. at 2.

Petitioner also describes his concerns regarding his employment during his illness, hospitalization, and recovery. Pet. Mot. at 11. He was anxious that his job was not secure. Id. He returned to work on July 31, 2018 at light-duty and with a walker. Id. "When he returned to work, he had to deal with ongoing prejudice from his work peers and management. For example, he had to explain his absence, fatigue, his use of a walker, and then a cane, [and] even prove that he was mentally capable." Id. Petitioner reported "feel[ing] constant stigma surrounding his GBS episode." Id. He also had anxiety when he learned the Covid-19 vaccine was required by his employer. Id.

Additionally, Petitioner explains his GBS impacted his family relationships, averring that he lost one year with his children. Pet. Mot. at 12. He added that he was also unable to do planned house repairs. Id.

Petitioner feels he is at his "new 'normal.'" Pet. Mot. at 12 (quoting Pet. Ex. 27 at ¶ 19). He remains on "high alert" when he feels any "electrical surge, cramp, or increase in the severity of his neuropathy" due to relapse concerns. Id. He has "a phobia of vaccines for himself and his family," causing him "great struggles." Id. He continues to struggle with being as active as he used to be, his agility, his anxiety concerning future vaccinations and potential GBS symptoms, and his more sensitive nose and gag reflex. Id. Petitioner "believe[s] [he] [is] back to roughly 85% on the energy level, and 80 % of the fitness level that [he] was pre-GBS." Id. (quoting Pet. Ex. 27 at ¶ 19).

Furthermore, Petitioner cites to his three most recent wellness examinations with his primary care provider in 2020, 2021, and 2022. Pet. Mot. at 13. At all three visits, he continued to have neuropathy from his GBS, primarily in his hands and feet, for which he was prescribed and taking Cymbalta. Id. He notes that at his most recent examination on November 22, 2022, five-and-one-half years following his GBS diagnosis, his provider described his neuropathy due to his GBS as "chronic." Id. (quoting Pet. Ex. 25 at 4). His provider also documented that "Cymbalta every other day seems to keep his symptoms at bay." Id.

Next, Petitioner provides a detailed examination of three prior cases in the Vaccine Program, which he argues are comparable. Pet. Mot. at 14-17. Petitioner contends his case is most similar to that of the petitioner in Devlin v. Secretary of Health & Human Services, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). Pet. Mot. at 14. The petitioner in Devlin was hospitalized with GBS for 12 days and received seven courses of plasmapheresis. Id. (citing Devlin, 2020 WL 5512505, at *3). Like Petitioner here, the petitioner in Devlin reported multiple visits to various providers and extreme anxiety prior to and after receiving a

11

diagnosis. Id. (citing Devlin, 2020 WL 5512505, at *3). However, unlike the petitioner in Devlin who was recently retired, Petitioner had anxiety concerning the impact his GBS had on his job security before and after returning to work. Id. (citing Devlin, 2020 WL 5512505, at *3). The Devlin petitioner did not go to inpatient rehabilitation but did PT for two months and continued with home exercises, like Petitioner here; however, Petitioner argues that he, unlike the Devlin petitioner, required a second round of PT. Id. (citing Devlin, 2020 WL 5512505, at *3). The petitioner in Devlin stopped treatment for his GBS 11 months after onset. Id. at 14-15 (citing Devlin, 2020 WL 5512505, at *3). At this time, his GBS was "resolved," although he continued to have tingling in his feet and toes and continued to drop items. Id. at 15 (quoting Devlin, 2020 WL 5512505, at *3). Here, Petitioner argues he continues to suffer from neuropathic pain more than five years after onset and continues to take medication for the pain. Id.

The Devlin petitioner was awarded $180,000.00 in actual pain and suffering and was not awarded future pain and suffering. Pet. Mot. at 14 (citing Devlin, 2020 WL 5512505, at *4). The special master, in awarding this amount, accounted for the fact that Petitioner's symptoms worsened over the time in which he sought a diagnosis and "he was understandably troubled by the uncertainty surrounding his condition and its cause." Id. (quoting Devlin, 2020 WL 5512505, at *3).

Petitioner also argues his case is "strikingly similar" to the petitioner in Robinson v. Secretary of Health & Human Services, No. 18-88V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020). Pet. Mot. at 15. Like the petitioner in Robinson, Petitioner "was a busy family man when he became ill with GBS" and "worried for [his] famil[y] during [his] illness." Id. (citing Robinson, 2020 WL 5820967, at *6). Their symptoms "were equally distressing," as physicians struggled to find a proper diagnosis for both Petitioner and the Robinson petitioner. Id. (citing Robinson, 2020 WL 5820967, at *6). Additionally, Petitioner and the Robinson petitioner both had brief hospitalizations, improved on IVIG, "were out of work for a short time frame," and "missed out on time and activities spent with children." Id. (citing Robinson, 2020 WL 5820967, at *6).

Petitioner contends his physical pain and suffering is worse than the Robinson petitioner's pain and suffering because her "only complaint three years after GBS was some residual numbness and tingling in her hands and feet—not ongoing neuropathic pain" that Petitioner here continues to suffer from. Pet. Mot. at 15-16 (citing Robinson, 2020 WL 5820967, at *3). The special master in Robinson awarded $160,000.00 for pain and suffering, and Petitioner argues he "should be awarded more . . . due to his ongoing pain and lengthier course." Id. at 16 (citing Robinson, 2020 WL 5820967, at *7).

Lastly, Petitioner compares his case to Setaro v. Secretary of Health & Human Services, No. 19-0207V, 2021 WL 1440207 (Fed. Cl. Spec. Mstr. Mar. 16, 2021). Pet. Mot. at 16. Both Petitioner and the Setaro petitioner "experienced emotional distress due to [their] doctors' delay in diagnosing [their] symptoms." Id. (citing Setaro, 2021 WL 1440207, at *4). The petitioner in Setaro had a lengthier hospitalization (11 days), which Petitioner states is "attributable to the fact that his doctors could not diagnose him for a full week." Id. (citing Setaro, 2021 WL 1440207, at *2). Petitioner in Setaro received three days of IVIG once he was diagnosed, followed by nine

12

days of inpatient rehabilitation, after which he was "feeling terrific," while Petitioner here "was certainly not reported to be doing so well within [one] month of GBS onset." Id. (citing Setaro, 2021 WL 1440207, at *2). The Setaro petitioner then completed outpatient PT within two months, similar to Petitioner. Id. (citing Setaro, 2021 WL 1440207, at *3). The petitioner in Setaro continued to visit his primary care physician and neurologist over the next two years for complaints of "generalized pain and weakness, fatigue, and numbness and tingling in his extremities." Id. (citing Setaro, 2021 WL 1440207, at *3). He was retired at the time of his GBS and was able to return to golf (four to five times per week), although he found he was not playing at the level he used to. Id. (citing Setaro, 2021 WL 1440207, at *4).

The special master in Setaro awarded $160,000.00 in past pain and suffering, an award, the special master explained, "balance[ed] [his] extensive initial treatment with his significant and relatively uncomplicated recovery." Pet. Mot. at 17 (quoting Setaro, 2021 WL 1440207, at *4). Petitioner contends his treatment was "not much different;" he also had "many outpatient visits with no diagnosis, coupled with a brief hospital stay." Id. Additionally, the special master in Setaro awarded $500.00 per year in future pain and suffering due to the continued residual symptoms and medication for pain control. Id. (citing Setaro, 2021 WL 1440207, at *5).

Lastly, Petitioner addressed Respondent's contentions that Petitioner's case is distinguishable from Devlin, Robinson, and Setaro. Pet. Reply at 8-9. Petitioner acknowledges his hospitalization was five days and he returned to work within six weeks. Id. at 8. However, Petitioner disagrees with Respondent's arguments that Petitioner had a "near complete resolution of symptoms within three months of onset," given "he required PT for sequelae of his GBS 18 months into his clinical course" and "still requires Cymbalta for neuropathic pain to this date, five years later." Id. at 8-9 (emphasis omitted) (quoting Resp. Br. at 10).

B.     **Respondent's Contentions**

Respondent argues that based on the facts of this case, Petitioner should be awarded $105,000.00 for past pain and suffering. Resp. Br. at 1, 6. Respondent did not specifically address Petitioner's request for future pain and suffering. See id. at 1-13.

Respondent reasons that Petitioner's medical records do not support a finding that he experienced a severe course of GBS, and instead contends Petitioner's GBS was mild to moderate and time-limited. Resp. Br. at 6. Petitioner's symptoms began on or around May 25, 2018. Id. at 6. He was diagnosed with GBS on June 15, 21 days post-GBS onset. Id. at 7, 7 n.4. He was then hospitalized for five days, from June 15 to June 19. Id. at 7. Thereafter, he began PT and returned to work six weeks after GBS onset. Id. By the end of August 2018, three months following onset, Petitioner was discharged from PT with "near normal" strength and he was working full time. Id. Respondent summarizes that Petitioner's treatment involved oral

steroids, one round or five days of IVIG[11] during a five-day hospitalization, and 14 PT sessions. Id.

Respondent also notes Petitioner only needed to see a neurologist twice following this treatment, in December 2018 and May 2019.  Resp. Br. at 7.  Respondent notes Petitioner "reported only mild residual sensory symptoms" at the visit in May 2019, which the neurologist opined "may continue to slowly improve." Id. (quoting Pet. Ex. 4 at 4).  Petitioner also reported staying active.[12]  Id.  And his physical examination at the May 2019 visit revealed "'very normal' strength, bulk, and tone in [P]etitioner's arms and legs[] and no neurological symptoms."[13]  Id. (quoting Pet. Ex. 4 at 4).

Additionally, Respondent asserts that Petitioner's ongoing sequelae are minimal.  Resp. Br. at 7.  He has not required a neurological follow-up since May 2019, just under one year post-GBS onset.  Id.  His recent primary care records reveal his residual symptoms are mild neuropathy, managed by Cymbalta every other day.  Id.  And despite his fears of vaccination, he received a Tdap vaccine in May 2022.  Id. at 7-8 (citing Pet. Ex. 27).

Respondent argues there is not preponderant evidence that Petitioner's 2020 PT sessions are related to Petitioner's GBS in 2018 because "Petitioner [was] the only one to attribute his elbow and, later, hip symptoms to his episode of GBS [18] months prior."  Resp. Br. at 8.  Additionally, Petitioner did not report hip or elbow pain to his neurologist, and only reported elbow pain to his primary care physician once, and his primary care physician characterized it as "tennis elbow."  Id. (quoting Pet. Ex. 3 at 18).  Nor is there support for Petitioner's contentions of "severely underdeveloped muscles" in his medical records.  Id. (quoting Pet. Ex. 27 at ¶ 17).

Respondent finds "Petitioner's residual peripheral neuropathic symptoms do not appear to be debilitating, nor do they currently place him at risk for increased morbidity or mortality."  Resp. Br. at 8.  For support, Respondent cites to Petitioner's last neurology visit in May 2019, where Petitioner's neurologist documented his symptoms will improve.  Id. (citing Pet. Ex. 4 at 3).  Respondent notes "mild symptoms of peripheral neuropathy (non-GBS related) are not uncommon (for example, in diabetes), and those living with them live very full and complete lives."[14]  Id. at 9.

---

[11] Respondent states Petitioner received "one round of IVIG during his five-day hospitalization." Resp. Br. at 7; see Pet. Ex. 5 at 10 (admitting Petitioner for five days of IVIG); Pet. Ex. 5 at 130, 132, 134-35, 138 (indicating Petitioner received IVIG treatments on June 15, June 16, June 17, June 18, and June 19).

[12] The neurologist documented Petitioner "used to exercise, has not been doing that but stays physically active."  Pet. Ex. 4 at 4.

[13] Physical examination from this visit on May 2, 2019 documents deep tendon reflexes of 2+ at knees, 1+ at biceps, and reduced/absent at ankles.  Pet. Ex. 4 at 4.

[14] Petitioner does not have diabetes.

In determining an award of $105,000.00 for past pain and suffering is appropriate, Respondent compares Petitioner's case with other Vaccine Program cases. Resp. Br. at 9-12. First, Respondent cites to other cases with Petitioner's law firm in which Respondent proffered this same or similar amount. Id. at 9-10. However, Respondent does not provide citations to these cases, and thus, the undersigned is unable to verify the facts of those cases in order to fully compare the facts and circumstances of those cases to this case.

Next, Respondent briefly discusses the cases Petitioner compared his case to and argues they are distinguishable. Resp. Br. at 10-12. Respondent summarizes that Petitioner had a "limited hospital stay" of five days, "conservative treatment" without inpatient rehabilitation, returned to work within six weeks, and had a "near complete resolution of symptoms within three months of onset," and thus, Petitioner's case is "objectively less severe" than the cases cited by Petitioner. Id. at 10-11.

Petitioner in Devlin was 65 years old, hospitalized for 12 days, received seven courses of plasmapheresis, received outpatient PT for six weeks, and had residual symptoms, and was awarded $180,000.00 in past pain and suffering. Resp. Br. at 11. Petitioner in Robinson was 41 years old and hospitalized for six days with an episode of tachycardia, severe lumbar puncture migraines, and time spent in the intensive care unit ("ICU") for a lumbar puncture. Id. The Robinson petitioner also received 20 sessions of outpatient PT, was unable to work for three months, and had residual numbness and tingling. Id. The past pain and suffering award was $160,000.00. Id. Next, the petitioner in Setaro was a retiree, was hospitalized for 11 days, received one round of IVIG, spent nine days in inpatient rehabilitation, and followed up with neurology for more than two years for "continued neurological symptoms[,] including diminished reflexes, facial sensation, and unsteady gait," and medication for pain control. Id. Petitioner in Setaro was awarded $160,000.00 in past pain and suffering and $500.00 per year in future pain and suffering. Id.

Respondent also cites to Dillenbeck, Johnson, and Fedewa. Resp. Br. at 11-12 (citing Dillenbeck v. Sec'y of Health & Hum. Servs., No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), aff'd in part, 147 Fed. Cl. 131 (2020); Johnson v. Sec'y of Health & Hum. Servs., No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); Fedewa v. Sec'y of Health & Hum. Servs., No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020)). Petitioner in Dillenbeck was 61 years old, hospitalized for two weeks, received substantial PT and multiple rounds of IVIG, ambulated with a walker and fell often, received five to six months of live-in care, was out of work for three months and was unable to return to pre-GBS job, and suffered from ongoing paresthesias, chest sensitivity, and an unsteady gait. Id. The past pain and suffering award was $170,000.00. Id.

The past pain and suffering award in Johnson was $180,000.00. Resp. Br. at 12. The Johnson petitioner was 66 years old at GBS onset, was hospitalized for five days, received one round of IVIG, was unable to walk unassisted or drive for four months, was prevented from working full-time for six months, and suffered from residual fatigue, numbness, and incontinence. Id.

Lastly, the petitioner in Fedewa was 54 years old, was hospitalized for eight days, received IVIG, had inpatient rehabilitation, was prescribed gabapentin for nerve pain, received substantial outpatient therapy, was unable to drive or work for three months, suffered muscle numbness and weakness for one-and-one-half years, and reported ongoing chronic fatigue and depression. Resp. Br. at 12. The Fedewa petitioner was awarded $180,000.00 in past pain and suffering. Id.

Respondent contends each of these cases are "objectively more severe than [P]etitioner's in terms of the amount of treatment, duration of disability, and nature of ongoing sequela," and therefore, this case "warrants a comparatively lower pain and suffering award" or $105,000.00. Resp. Br. at 12. Respondent did not specifically address Petitioner's request for future pain and suffering. See Resp. Br. at 1-13.

## IV. LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, Petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which [P]etitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge

the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Graves, 109 Fed. Cl. at 589-96.  Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Id. at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

## V. ANALYSIS

### A. Petitioner's Past Unreimbursable Expenses

Petitioner's past unreimbursable medical expenses are uncontested.  Both parties agree Petitioner's past unreimbursable medical expenses are $6,430.80.  Pet. Mot. at 3; Resp. Br. at 1. Thus, the undersigned finds Petitioner is entitled to receive an award of $6,430.80 for past unreimbursable medical expenses.

### B. Petitioner's Award for Actual Pain and Suffering

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $170,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress.  In the undersigned's experience, awareness of suffering is not typically a disputed issue in cases involving GBS.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering.  Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he had full awareness of his suffering.

With respect to severity and duration, Petitioner has suffered from GBS and its residual sequela since May 25, 2018, over five-and-one-half years.  During this time, he experienced back pain, weakness, and neuropathic symptoms, including tingling and cutaneous burning discomfort.  He made a very good recovery, as evidenced by the medical records, and his own declarations, but that does not minimize the fact that he experienced the problems described in the records and his declarations.

The factors that influence this Ruling are as follows.  Petitioner's symptoms began approximately May 25, 2018, when he had tingling in his feet, hands, and tongue, as well as leg cramps.  He sought treatment from medical providers on June 4 and June 7 due to worsening back pain and tingling in arms and legs.  He underwent several MRI studies and PT.  On June 14, Petitioner was seen by a neurosurgeon and reported dizziness, night sweats, weight loss, mouth dryness, stiff/swollen joints, problems sleeping, sexual dysfunction, difficulty walking and swallowing, and problems with taste and smell.  By this time, he used a rolling walker to ambulate.  The next day, June 15, Petitioner saw a neurologist, who noted progressive weakness and absent deep tendon reflexes, and diagnosed GBS, which was confirmed by EMG.  This brief summary shows that over the course of several weeks, Petitioner presented to different providers and underwent a number of diagnostic studies and other treatments before the diagnosis of GBS was made.

Once diagnosed with GBS, Petitioner was hospitalized five days and underwent IVIG treatment, PT, occupational therapy.  After hospital discharge, Petitioner had outpatient PT for approximately two months, June 27 to August 20, 2018.  Records from June 27 reveal that Petitioner had back soreness, neuropathy, was walking with a cane, and had difficulty with stairs.  After completing PT in 2018, Petitioner was walking independently without a cane and demonstrated significant improvement, but he continued to have neuropathy in the hands, feet, and nose.

In 2020, Petitioner returned to PT for elbow and hip pain.  Petitioner's elbow pain was evaluated by a physical therapist and was not assessed to be caused by Petitioner's GBS.  His chronic right hip pain, however, was attributed to GBS by the physical therapist who performed the assessment.  Therefore, Petitioner is entitled to compensation for the pain and suffering related to his hip pain.

Regarding his neuropathy, Petitioner was prescribed Cymbalta for residual tingling and cutaneous burning discomfort in December 2018.  Initially, Petitioner took only one dose of Cymbalta due to its side effects.  However, due to continued symptoms, he began taking it regularly, and continued to take Cymbalta from 2020 through 2023.  In his second declaration, executed on April 3, 2023, Petitioner reported that he continued taking Cymbalta.  He also reported that his energy level was 85% of his pre-GBS level and his fitness level was at 80% of his pre-GBS level.

Further, Petitioner was 38 years of age when he developed GBS, and he was employed full-time.  He was married with three young children and was previously healthy with an active lifestyle.  Petitioner's declaration sets forth in detail the difficulties he experienced prior to his diagnosis of GBS, during his acute illness, and in his rehabilitation period.  Unlike many other petitioners who have post-vaccination GBS, Petitioner was employed and experienced the stress of being out of work due to his illness.  He also had concerns about job security due to his illness.

Lastly, Petitioner is the father of three young children. He described in his declarations the inability to care for himself and his reliance on his wife for activities of daily living. Petitioner also described feeling like he lost a year with his children due to his illness.

Considering the record as a whole, the undersigned finds that $170,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering. The undersigned also recognizes that Petitioner's duration of suffering has been longer than some of the other cases described. However, by comparison to some of the other cases cited, Petitioner's course was less severe. He did not require an ICU admission, a lengthy hospitalization, or inpatient rehabilitation. The award of $170,000.00 acknowledges that Petitioner has experienced a longer duration of suffering, the fact that he was employed and worried about job security and went back to work while he still required a walker to ambulate, as well as the nature of his suffering described due to his reliance on his wife and loss he felt as the father of three young children.

Regarding future pain and suffering, the undersigned find the facts here are similar to those in Setaro. See Setaro, 2021 WL 1440207. The petitioner in Setaro experienced chronic residual symptoms and was prescribed medication for control of those symptoms. Id. at *5. Here, Petitioner continues to have neuropathic symptoms for which he takes Cymbalta. Therefore, it is fair, reasonable, and appropriate to award the requested $500.00 per year for future pain and suffering, which shall be reduced to net present value as set forth below.

## VI.    CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $170,000.00 for actual pain and suffering; (2) $500.00 per year for Petitioner's life expectancy reduced to net present value for future pain and suffering;[15] and, (2) $6,430.80 for past unreimbursed expenses.

The parties are to file a joint status report within 30 days, **by Friday, February 2, 2024**, (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) providing a statement confirming that this Ruling reflects all items of damages and that no issues remain outstanding. If the parties are unable to agree on the amount of the net present

---

[15] Based on Petitioner's date of birth, June 21, 1979, Petitioner is expected to live for approximately 33 additional years based on the data for all males. See Elizabeth Arias & Jiaquan Xu, Nat'l Ctr. for Health Statistics, Ctrs. for Disease Control & Prevention, United States Life Tables, 2020, 71 Nat'l Vital Stat. Reps. 1, 2 tbl.A (2022).

value of the future award, the undersigned will use a one percent net discount rate for the first fifteen years, followed by a two percent net discount rate for the remaining years.[16]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

---

[16] See, e.g., Dillenbeck, 2019 WL 4072069, at *15 (applying a one percent net discount rate for the first fifteen years, followed by a two percent net discount rate for the remaining years), aff'd in part, 147 Fed. Cl. 131 (2020); Curri v. Sec'y of Health & Hum. Servs., No. 17-432V, 2018 WL 6273562, at *5 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (same); Petronelli v. Sec'y Health & Hum. Servs., No. 12-285V, 2016 WL 3252082, at *5-6 (Fed. Cl. Spec. Mstr. May 12, 2016) (analyzing the appropriateness of a one percent discount for future damages).